(No. 46911.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CLEO HISTER, Appellee.

*Opinion filed May 19, 1975.*

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel, Assistant Attorney General, and Patrick T. Driscoll, Jr., and Jerome Charles Randolph, Assistant State's Attorneys, of counsel), for the People.

Winston & Strawn, of Chicago (Ronald Butler, Thomas B. Donovan and Robert G. Foster, of counsel), for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Cleo Hister, and Joe Newson were jointly indicted and tried for the murder of Richard Wilson, found guilty by a jury, and each sentenced to serve 16 to 30 years in the penitentiary. In a separate appeal, Newson's conviction was reversed by the Appellate Court for the First District because the evidence failed to establish his guilt beyond a reasonable doubt. (*People v. Newson* (1971), 133 Ill. App. 2d 511.) On this appeal, a different division of that court reversed Hister's conviction for the same reason, one judge dissenting (20 Ill. App. 3d 933), and we granted the State's petition for leave to appeal.

The State contends that the evidence was not palpably contrary to the jury's verdict and that the appellate court erred by substituting its judgment for that of the trier of fact as to the credibility of the witnesses and the weight to be given their testimony. It is also argued that the appellate court improperly placed substantial reliance on the previous opinion reversing Newson's conviction which had been based on an accountability theory supported wholly by circumstantial evidence while Hister's conviction was based on stronger, more direct evidence. We cannot agree, for, in our judgment, the appellate court

opinion is clearly based on its independent analysis of the evidence against Hister which, although stronger than the evidence against Newson, is simply too confusing and contradictory to establish Hister's guilt beyond a reasonable doubt.

The facts of this case have been accurately set forth by the appellate court and need not be repeated in any great detail. Rather, we deem it sufficient to summarize the evidence, emphasizing only those portions of the State's case contributing to our conclusion that the State failed to meet its burden of proof. At approximately 10 p.m. on the evening of April 28, 1968, a 15-year-old boy named Richard Wilson was shot in the head while riding a bicycle in the 300 block of West 65th Street in Chicago. He was taken to a hospital, where he died on April 30, as a result of the gunshot wound. Richard had spent most of the evening of April 28 with his 17-year-old nephew, Eugene Adams, who was nicknamed "Feenanny." Adams admitted during the trial that, several weeks prior to the shooting, he and two friends had stolen a television set from an apartment he thought to be Newson's residence. The State utilized his testimony along with that of Johnny Wilson, Gregory Lee, Jesse Parnell, Dale Lee and Tony Lewis in an attempt to establish that both Newson and Hister were seen in the immediate vicinity of the shooting shortly before it occurred; that one or both of them were armed and looking for "Feenanny" and Richard concerning the stolen television; and that Hister had fired the shotgun blast that struck Richard in the head, and then fled with Newson and a third person in an automobile. Among the State's witnesses, only Jesse Parnell claimed to have observed the shooting of Richard; the others, including Adams, saw Hister or Newson, or both, in the area and heard shots, but did not actually see the shooting. Hister and Newson both presented alibi defenses, substantiated by relatives and girlfriends. Rebuttal and surrebuttal evidence was also presented, but is of little significance in

light of the inadequacies of the State's case in chief.

Other than decedent's father and the physician who performed the autopsy on Richard, the State's witnesses were young people ranging in age from 11 to 17 who lived in the neighborhood where the shooting occurred. The confusion created by their testimony can be illustrated by several examples. Since Adams admitted stealing Newson's television, the evidence reveals a possible motive for Newson to shoot Adams, but it is not entirely clear why Hister would have shot Richard Wilson in light of Adams's testimony that Wilson did not participate in the theft of the television. Moreover, Hister and Newson claimed that they did not even know each other at the time of the shooting, and the State, although admittedly producing evidence that the two were seen together that evening, did not produce any evidence that the two were friends prior to the shooting. While we do not suggest that establishing a motive was essential to the State's case, these factors weaken the State's attempt to do so. Johnny Wilson, the victim's father, testified that shortly before the shooting, while driving in the neighborhood, he had seen Newson, carrying a package he believed to conceal a weapon, in the company of Warren Parker, whom Mr. Wilson had known for many years. But Parker, one of the State's rebuttal witnesses, stated on cross-examination that he had not been with Newson at that time.

According to the testimony of Gregory Lee and Tony Lewis, they were riding a bicycle together in the neighborhood during the evening of April 28, 1968, yet their separate accounts of the events that transpired are quite dissimilar. Lee testified that as he and Lewis were riding the bicycle, he saw Newson and Hister and four other persons in a dark alley. One man was armed with a shotgun and fired at them from about 100 feet away, but missed and hit a nearby car. After he and Lewis ducked, a second shot was fired at "Feenanny" (Adams), who was walking a bicycle down the street, striking the seat of the bicycle and

"Feenanny's" arm. There is no other evidence in the record, including the testimony of Adams himself, indicating that Adams was wounded that evening. Lee then testified that he and Lewis had run from the scene, hearing a third shot as they ran, without ever being closer than 65 feet to the men in the alley. Lewis agreed that he and Lee were together on a bicycle, but said that they encountered Hister and Newson standing on a street corner rather than seeing them in an alley with four other men. Hister asked him if he knew "Feenanny," to which Lewis had replied in the negative. Newson then pulled out a gun, which Lewis thought to be a .38-caliber pistol, and held it threateningly, forcing him and Lee to remain there for about 15 or 20 minutes until a police car came by, allowing them a chance to escape down an alley. A shotgun was then fired down the alley by someone in a 1963 Chevrolet at the other end of the alley. Lewis had not seen where Newson and Hister had gone and did not know who fired the shot. He and Lee then went to the porch of a nearby house, where they saw "Feenanny" and told him that the boys on the corner were looking for him. Lewis stated that a second shot was fired while they were on the porch, but made no mention of any shot being fired at "Feenanny." The remarkable differences inherent in these two versions of the events makes it obvious that one or both of the witnesses was grossly mistaken or untruthful.

The record is replete with other instances of inconsistent testimony relating to the description of Hister and Newson, the clothing they wore, the number of persons with them, the type of automobile they were driving, who was armed and with what type weapon, what other witnesses were present, whether they were looking for Adams or Richard Wilson, the sequence and location of the events leading up to the shooting, and the number of shots fired.

Despite this, the State urges that the evidence, considered as a whole, is nonetheless sufficient to place

Newson and Hister in the area, armed and looking for Adams or Wilson or both. However, the only eyewitness, Jesse Parnell, stated that he was on his porch shortly before the shooting and had loaned his bicycle to Adams and Wilson, who had ridden off on it together. He first stated that he saw Newson and Hister after Adams and Wilson left, but then contradicted himself, stating that he had not seen Newson and Hister and didn't know what happened after Adams and Wilson rode away. His testimony became hesitant and some of his answers obviously surprised the assistant State's Attorney. Following a discussion in chambers, the trial judge allowed the State's motion to make Parnell a court's witness. The State then proceeded to cross-examine Parnell, using numerous leading questions. He first testified that he could not remember whether Hister and Newson came onto his porch after the departure of Adams and Wilson, but with the help of leading questions was able to recall that Hister had come to the porch and stuck a shotgun in his face, asking him the whereabouts of Wilson. Newson and a third young man were present but remained on the sidewalk. The three then left and went into a gangway on the other side of the street. He then saw Richard and "Feenanny" riding down the street on his bicycle. Hister then shot Richard in the face with the shotgun and fled the scene with Newson and the third man in an automobile. When Richard was shot, "Feenanny" jumped off the bicycle and ran away. "Feenanny" (Adams), however, testified that he and Wilson had borrowed two bicycles from two boys other than Parnell, that he and Wilson had not ridden on the same bicycle that night, and that he was not with Wilson at the time of the shooting. Furthermore, Parnell, on cross-examination by defense counsel, exhibited uncertainty as to his location at the time of the shooting and as to whether any of his friends had been with him on the porch. Additional questioning revealed that he had not actually seen Hister fire the shot at Wilson. Rather, he had

only seen a flash of light from an arm that was extended from behind the wall of a building across the street. He had not seen the head or the rest of the body but apparently believed it was Hister because the sweater on the arm was identical to the one Hister had been wearing just moments before; he admitted, however, that the street was not well lighted and was in fact so dark that he had been unable to determine what Newson was wearing. Moreover, he had not actually seen the heads and faces of the three boys who had fled in the car because they had their backs turned to him, but stated, "I know who it was." In our judgment, such an eyewitness account from a witness obviously reluctant to testify, who contradicted himself and was contradicted by Adams, hardly creates an abiding conviction that Hister shot Richard Wilson. Combining Parnell's testimony with that of the other witnesses for the State reveals a record which, as a whole, leaves us not only with a reasonable doubt of Hister's guilt but in a state of uncertainty as to the events surrounding the shooting of Richard Wilson.

"While questions of credibility and weight are for the jury, and we do not lightly take the step of reversing a jury's determination of guilt" (*People v. Kilgore* (1974), 59 Ill.2d 173, 178), it is nevertheless "the duty of this court to carefully review the evidence, and if it is not sufficient to remove all reasonable doubt of the guilt of the defendant and to create an abiding conviction that he is guilty, the conviction will be reversed." (*People v. Kidd* (1951), 410 Ill. 271, 276.) Since the State's evidence, without even considering Hister's alibi, is not sufficient to prove him guilty beyond a reasonable doubt, his conviction of the murder of Richard Wilson cannot stand. The judgment of the appellate court is affirmed.

*Judgment affirmed.*