THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEON BRAMLETT, Defendant-Appellant.

Fourth District   No. 4—90—0565

Opinion filed March 28, 1991.

Daniel D. Yuhas and Charles L. Jones, both of State Appellate Defender's Office, of Springfield, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Charles F. Mansfield, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LUND delivered the opinion of the court:

On June 19, 1990, defendant Leon Bramlett was found guilty by a jury sitting in the circuit court of Macon County of committing the offense of residential burglary. (Ill. Rev. Stat. 1989, ch. 38, par. 19—3.) He was subsequently sentenced to a 10-year period of imprisonment. Defendant now appeals.

On March 2, 1990, defendant was charged with committing the offense of residential burglary on the residence of Bobbie Jones. Mark Evans was similarly charged.

Prior to trial, defendant filed a motion seeking to sever his trial from that of Evans. It was alleged that Evans would be calling a witness who would place some of the stolen property in defendant's car

earlier than the time of the burglary, and that defendant would deny this. Accordingly, defendant maintained the defenses were antagonistic and the trial should be severed. The court denied the motion.

The first witness at the trial was Decatur police officer Thomas Butts. He stated that on February 28, 1990, at approximately 10:21 p.m., he was one block from the residence at 1805 Morgan, Decatur, Illinois. At that time, he observed four black males running from the residence with some items in their hands. Butts exited the car and chased them. As they ran, the men dropped the items they were carrying and split up. Butts eventually stopped one of them.

Butts returned and examined the house at 1805 Morgan. He found a window broken out and a door forced open. He also found a two-door brown Cadillac parked on the alley in the lot immediately north from the back door of 1805 Morgan. The trunk was partially open. In the passenger compartment, behind the seat, Butts found a gold clock and a picture. Butts acknowledged that since he did not get a good look at the fleeing subjects' faces, he could not say for sure one way or another whether defendant and Evans were among them.

Police officer James Chervinko was talking with Butts at approximately 10:21 p.m., when he also saw several people running from the 1800 block of Morgan. He believed there were three subjects. About 1 to 1½ minutes later, he observed a person running north in the east alley on the 1800 block of Morgan. This is on the opposite side of the street from 1805 Morgan. Chervinko followed him. The person ran north in the east alley, then crossed the street and ran in the west alley of the 1800 block of Morgan. Eventually, since the person would not stop when called, Chervinko chased and tackled him north of 1805 Morgan. This person originally gave a false name, but then admitted he was Mark Evans.

Sergeant Robert Harvey heard the radio transmissions of this incident and responded to the area. When he arrived around 10:23 p.m., he observed two black men running down the driveway of 1805 Morgan. The two men ran across Morgan, over to the east, and then split up. Harvey stopped one subject, the defendant, running north on Morgan Street. He saw the other subject run to the alley east of Morgan and then turn north. He stated that Chervinko caught this individual. On cross-examination, he acknowledged that he simply called to defendant and defendant stopped running and returned to him. He also admitted that he could not identify Evans as being the other man who ran away, though he could not exclude him either.

The State presented the testimony of Bobbie Jones, who resides at 1805 Morgan, and who identified the items found in the car and the

yard as belonging to her. She stated she never gave defendant or Evans permission to enter her house on February 28, 1990. The State also establishes that a fingerprint of Evans was found on the gold clock found in the car, and that the car belonged to the defendant and Amos Lofton.

The State's final witness was 13-year-old Leslie Taylor. On February 28, 1990, she was walking to her grandmother's house, which took her past 1805 Morgan. She saw three men coming from the back of the house and identified one as Evans. The men were carrying something and walking toward the Cadillac parked in back. She knows defendant, but she does not think she saw him that night. She also did not see any of these people actually come out of the house.

Defendant's first witness was Facelli Drummer, who is a sister of defendant's girlfriend. She testified that on February 28, 1990, around 8 p.m., he came to her house and visited with her and her sister. He was walking at the time. He left around 10 p.m. when the news came on. She acknowledged finding out the day before, for the first time, that she would be a witness, and that she has a retail-theft conviction.

Defendant testified and acknowledged he is part owner of the Cadillac with Amos Lofton. He explained he is simply the cosigner. On February 28, 1990, he used the car around 2 p.m. to give Theresa Snow and Evans a ride to the store so that Snow could cash her support check and do some shopping. He had to go get the car from Lofton. At the time he gave Snow and Evans the ride, the gold clock and picture were not in the vehicle. When they were done, he dropped them off and returned the car.

He then walked over to Drummer's around 8 p.m., and left a little after 10 p.m. On the way back, he walked down Morgan Street, which is the way he always goes. When he arrived near the 1800 block of Morgan, the police stopped him about a purse snatching. They then went to the house and started talking about a residential burglary. He did not run from the police, but the person who was with him did. This person was Terry Link, who started walking with defendant several blocks earlier. Defendant stated he did not enter Jones' house, did not drive the Cadillac that evening, and did not possess any of the stolen items.

On cross-examination, he acknowledged he has a felony conviction for unlawful possession of a registration sticker. He also acknowledged that his name was first on the title and registration, but maintained he only acted as the cosigner for the car. He stated that he was simply walking on the sidewalk at the time of his arrest. He denies running

down the driveway or running from Harvey. He has no idea why the car was at the scene.

Theresa Snow, Mark Evans' girlfriend, stated that on February 28, 1990, she arrived home from work around 3:30 p.m. and asked Evans to get defendant to take them to the store. They went to the store in defendant's Cadillac. When they were putting the groceries in the back, she saw a gold object on the floor of the backseat which Evans had to move. Evans then stayed at her house until around 11 p.m., when he left to get cigarettes. He never returned.

On cross-examination, she stated she saw nothing else in the car. She denied earlier telling an officer that she saw nothing in the car. She explained that he asked if she saw a clock, and she said she did not because she did not know what the gold object was.

Evans testified similarly to Snow concerning the shopping. When he put the groceries in the car, he had to move the clock out of the way. This would have been around 4:30 p.m. He then returned to Snow's house until approximately 10:50 p.m. He left to get some cigarettes. Snow's house is one block north of Jones' house. As he walked past Jones' house, he saw some people exit the house and run. Two police cars came after them. He hid at that time because he had two failure-to-appear warrants outstanding. He then ran when the police saw him. The reason he ran and gave the false name was because of the warrants. He did not see defendant in the area. He acknowledged having a retail theft conviction.

On rebuttal, police officer Rick Jones testified that Snow told him that when she was in the car she did not observe a clock or any other property. She did not tell him that she saw Evans move a gold object. The jury found the defendant and Evans guilty, and defendant received a 10-year prison sentence. Defendant now appeals, asserting (1) he was not proved guilty beyond a reasonable doubt; (2) the court erred in denying his motion for a severance of his trial from that of Evans; and (3) improper comments by the prosecutor denied him a fair trial. We disagree and affirm.

■ The standard of review in sufficiency of the evidence cases is well settled. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671, 676.) When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Once the defendant has been found guilty of the charged crime, the fact finder's role as weigher of the evidence is preserved

through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) The relevant question is whether, if after viewing the evidence in such a fashion, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) This standard applies in all criminal cases, whether the evidence is direct or circumstantial. *People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346.

Defendant argues there are many factors which establish he did not commit the crime. Among these are: (1) no one saw him enter or leave the house; (2) Taylor testified she saw Evans but she did not see defendant; (3) there were no fingerprints of defendant in the house or on the stolen property; (4) when he was arrested there was no incriminating evidence in defendant's possession; and (5) there was no evidence showing defendant was in control of the car on the night in question.

■ We find the evidence, considered in the light most favorable to the State, sustains the conviction. It is clear the burglary was taking place. Defendant concedes that. The sole question is his involvement, or lack thereof, as a principal or under an accountability theory.

The evidence, considered within the above-stated framework, establishes that Butts saw, at 10:21 p.m., four men running south from Jones' house with items in their hands. They dropped these as they fled. Butts chased three, catching one, with two getting away. Chervinko also saw the men running, though he saw only three. Within one or two minutes, he saw Evans in the alley on the east side of Morgan Street running north. He chased and caught him. At about that same time, Harvey saw defendant and another man running down a driveway next to Jones' house. He took chase. Defendant stopped, and the other person crossed the street to the east side of Morgan Street and ran north in the alley. Harvey stated this is the man Chervinko caught, Evans. Thus, the evidence established that the defendant was in the presence of Evans at the time of the chase.

The evidence further establishes that Evans was seen at the back of the house heading to the car carrying some items, and that the clock in the car had his fingerprint on it. Also, the car containing the stolen property belonged in part to defendant. Therefore, the evidence has defendant running in the presence of a person who is clearly involved in the burglary, while defendant's car is near the broken-in door and

contains stolen property. This is sufficient to establish defendant's involvement in the crime.

■ Admittedly, Taylor said she did not see defendant among the men at the back of the house. However, she said she saw three people and Butts testified he saw four running. Thus, the jury could reasonably have concluded that defendant was out of her sight at the time. Also, while defendant has presented an alibi and explanation, this testimony conflicts with that of Harvey in critical ways (*i.e.*, whether defendant was running down the driveway). It is the responsibility of the trier of fact to determine the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 796, 110 S. Ct. 3288.) The jury could have reasonably concluded that defendant was lying in this regard, which would cast a cloud on all his testimony. Accordingly, we find that defendant was proved guilty beyond a reasonable doubt.

Prior to trial, defendant made a motion seeking to sever his trial from that of Evans, maintaining that the testimony that the gold clock was in his car earlier that evening would prejudice him. The court denied the motion. Defendant believes this was error.

■ The long-established rule in this jurisdiction is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. (*People v. Byron* (1987), 116 Ill. 2d 81, 92, 506 N.E.2d 1247, 1251; *People v. Lee* (1981), 87 Ill. 2d 182, 187, 429 N.E.2d 461, 463.) At least two types of prejudice can be readily identified. (*Lee,* 87 Ill. 2d at 187, 429 N.E.2d at 463.) The first is when a codefendant's confession is to be introduced. (*People v. Bean* (1985), 109 Ill. 2d 80, 93, 485 N.E.2d 349, 355; *Lee,* 87 Ill. 2d at 187, 429 N.E.2d at 463.) The second is when the codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 542, 468 N.E.2d 969, 973.) The decision to grant a severance is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Byron,* 116 Ill. 2d at 92, 506 N.E.2d at 1251.

■ It is this second variety of prejudice, antagonistic defenses, which is involved in the present case. Severance is required when the defenses are so antagonistic that a severance is imperative to ensure a fair trial. (*Byron,* 116 Ill. 2d at 92, 506 N.E.2d at 1251; *Lee,* 87 Ill. 2d at 187, 429 N.E.2d at 464.) Actual hostility between the two defenses is required. (*Bean,* 109 Ill. 2d at 93, 485 N.E.2d at 355.) This is gener-

ally the situation in which one defendant points a finger at the other as the real perpetrator of the offense (*Lee*, 87 Ill. 2d at 187, 429 N.E.2d at 463), or where each defendant is protesting his innocence in condemning the other (*Daugherty*, 102 Ill. 2d at 542, 468 N.E.2d at 973). Thus, antagonistic defenses have been confined to those instances where one codefendant testifies implicating the other. *People v. Murphy* (1981), 93 Ill. App. 3d 606, 609, 417 N.E.2d 759, 761; *People v. Precup* (1977), 50 Ill. App. 3d 23, 29, 365 N.E.2d 1007, 1010.

Defendant's concern in the case at bar is over the testimony of Evans and Snow placing the stolen clock in his car earlier in the afternoon of February 28, 1990. He observes that codefense counsel referred to this testimony in his opening and closing statements, suggesting that a prior burglary had taken place to procure the clock. Thus, defendant argues Evans' counsel not only implicated him in this burglary, but also in a possession of stolen property offense. He relies on *Byron* and *Bean* in asserting this is a sufficiently antagonistic situation to require severance.

Defendant's reliance on *Bean* and *Byron* is misplaced. Those cases involved situations where the trials became more contests between the codefendants than the State and defendants. (*Bean*, 109 Ill. 2d at 94, 485 N.E.2d at 355; *Byron*, 116 Ill. 2d at 93, 506 N.E.2d at 1252.) Both *Lee* and *Bean* cited *People v. Braune* (1936), 363 Ill. 551, 2 N.E.2d 839, the fountainhead of this State's jurisprudence in this area, and quoted the following language:

> "The trial was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants attempted to destroy each other." *Braune*, 363 Ill. at 557, 2 N.E.2d at 842.

The present case involves no such controversy. The evidence that the clock was in the car six to eight hours prior to the burglary does not implicate defendant in being involved in the residential burglary at 10:30 p.m. As noted in the earlier discussion, defendant's criminal involvement is established without any reference to the clock. Thus, this evidence has little impact on defendant's case. Further, except for the clock, Evans' testimony was of assistance to defendant. Evans stated he saw the people leaving the house, but he also stated he did not see defendant in the area. Since much of the State's case hinges on the two of them being together, this testimony is beneficial.

Since this case did not become a contest between Evans and defendant, which is the situation the courts are concerned with, and since care must be taken in severance cases to ensure that the nature

of the defenses are truly inconsistent (see *Lee*, 87 Ill. 2d at 187, 429 N.E.2d at 464), we conclude that the motion was properly denied.

Defendant's final assertion was that he was denied a fair trial by the prosecutor's reference in cross-examination and in closing argument to the fact that the arresting officer was of the same race as defendant.

On cross-examination, when asking defendant to explain the conflicts in his testimony with that of Officer Harvey, the prosecutor queried:

> "Q. [Prosecutor:] Now, you saw Officer Harvey, the Black sergeant yesterday; right?
>
> * * *
>
> Q. [Prosecutor:] Okay. Do you have any idea why a—another Black—a Black police officer would say that about you?
>
> ***
>
> Q. [Prosecutor:] So, you're saying, you've no idea why the Black police officer would testify the way he did?"

In closing argument, the prosecutor stated:

> "What about Leon Bramlett. He testifies for himself. What's the noteworthy thing that Leon Bramlett has to say. Leon Bramlett says, 'I was never running at the scene. No policeman ever chased me.' You heard Sergeant Robert Harvey testify from the witness stand that he saw the defendant running through Bobbie Jones' driveway and had to chase him down. When he ordered him to stop, he stopped. Somebody's not telling the truth. Now, who are you going to believe, Robert Harvey or the defendant. Now, this isn't some case of some White police officer coming to court and saying, 'Yeah. I saw that Black man, and he was running.' You saw Sergeant Robert Harvey. He's a sergeant for the Decatur Police Department, a Black; and he said, 'I saw another Black running.' "

■ Initially, we observe, concerning the questioned cross-examination, that defendant made no objection, nor did he include this argument in his post-trial motion. It is well settled that the failure to do so waives any asserted error. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

Defendant did object to the closing argument, but was overruled. He now notes that "[n]o one will question that appeals to racial prejudice, whether open or oblique, discredit our justice and are to be condemned." (*People v. Dukett* (1974), 56 Ill. 2d 432, 443, 308 N.E.2d 590, 596.) The supreme court has repeatedly so commented. In *People v.*

*Johnson* (1986), 114 Ill. 2d 170, 199, 499 N.E.2d 1355, 1368, the court observed that a reference to defendant as " 'that black man' " by the prosecutor in closing argument was "unnecessary and potentially offensive." Recently, in *People v. Thomas* (1990), 137 Ill. 2d 500, 543, 561 N.E.2d 57, ·75, the court found reference to the victim's race was improper.

■ However, while the court did make the above comments, in each case the court found no reversible error occurred. The ultimate question in each case was whether the comments constituted a material factor in the result. (*Dukett*, 56 Ill. 2d at 443-44, 308 N.E.2d at 596; *Johnson*, 114 Ill. 2d at 199, 499 N.E.2d at 1368; *Thomas*, 137 Ill. 2d at 543-44, 561 N.E.2d at 75.) This is the conventional analysis for any prosecutorial comments at closing arguments. (See *People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970, 976; *People v. Berry* (1960), 18 Ill. 2d 453, 458, 165 N.E.2d 257, 259.) In concluding that no reversible error occurred, the *Johnson* and *Thomas* courts relied on the following facts: (1) the statement was an isolated statement; (2) the prosecutor did not dwell on it; (3) the jury could see the racial makeup of the individuals; and (4) the jury was instructed to consider only the evidence and not counsel's argument in reaching its verdict. *Johnson*, 114 Ill. 2d at 199, 499 N.E.2d at 1368; *Thomas*, 137 Ill. 2d at 543, 561 N.E.2d at 75.

■ Applying this analysis to the present controversy leads to a similar conclusion. The remark was isolated, and the prosecutor did not dwell on it. It was readily apparent to the jury that defendant and Harvey are both black. The jury was also instructed to rely only on the evidence and not on counsel's argument. Thus, we find *Johnson* and *Thomas* controlling, and conclude there is no reversible error.

Defendant believes that our decision should follow the holdings of *People v. Turner* (1977), 52 Ill. App. 3d 738, 367 N.E.2d 1365, and *People v. Richardson* (1977), 49 Ill. App. 3d 170, 363 N.E.2d 924. However, those cases are distinguishable by their much more egregious fact situations.

In *Turner*, the incident involved an altercation between two black girls and a white girl. The prosecutor in closing argument apologized for using, on a black defense witness, such big words as "spectator," and the prosecutor accused the witness of wishing to observe "blacky tromp whitey." The court, in reversing, observed the phrase "blacky tromp whitey" or the suggestion that the witness was going to watch two black girls beat up a whitey never came up at trial, and that the sole purpose of the argument was to arouse racial animosity and de-

prive defendant of a fair trial. *Turner*, 52 Ill. App. 3d at 739-40, 367 N.E.2d at 1366-67.

In *Richardson*, a black defendant with black witnesses robbed a white person. Pertinent parts of the State's closing argument were:

> " 'First of all, concerning the defendant's witness, you have to remember that they don't live in the same social structure that we do, that you and I do. The witnesses that the defendant brought are street people—simple as that. The society they live in do [*sic*] not consider the truth a great virtue. The society they live in, they lie every day. It is nothing to them to protect one of their own kind by lying.

> \* \* \*

> Here is [the victim] here saying, "yes, I had intercourse, I had intercourse with a black woman." That is embarrassing. It is so embarrassing [*sic*] it is reasonable to believe the rest of the story is true. When a man comes up and says "yes, I had intercourse with a black" wouldn't lie about anything else. If he is going to lie about anything else, he wouldn't admit having intercourse with a black woman. Now that is reasonable. He is telling you the truth. That is the way it happened.' " (*Richardson*, 49 Ill. App. 3d at 172-73, 363 N.E.2d at 926.)

The court, in reversing, observed that these were not isolated incidents, but that the tenor of the argument was an appeal to prejudice and an attempt to affect the credibility of witnesses, not by the evidence but by their race. *Richardson*, 49 Ill. App. 3d at 173, 363 N.E.2d at 926.

These are clearly different situations from the one now facing us. In fact, the present situation is not as serious as those in *Johnson* and *Thomas*, where the comments were potentially more offensive in that they injected into the cases the racial difference between the victim and the defendant. Here the subject of race, not racial prejudice, was presented and argued. Accordingly, we conclude those cases control, and no reversible error exists.

We reach this conclusion, assuming the statements were error. As the comments of our supreme court suggest, counsel should be very careful in making any racial references. This does not mean they can never be made. We can envision the case in which a defendant asserts his arrest is due entirely to racial prejudice. In such a case, the race of the arresting officer could be a legitimate factor for the jury to consider. This is the State's position as to what happened here and why the comment should be found appropriate. However, it does not appear

from the record that this door was opened by the defendant. Regardless, we find no reversible error occurred.

Affirmed.

SPITZ and McCULLOUGH, JJ., concur.