THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JORGE CARVAJAL, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN C. TORRES, Defendant-Appellant.

Second District   Nos. 2—91—0454, 2—91—0463 cons.

Opinion filed February 26, 1993.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellants.

David R. Akemann, State's Attorney, of Geneva (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Jorge L. Carvajal and Brian C. Torres, defendants, were convicted by a jury in the circuit court of Kane County of one count of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)), and two counts each of attempt (murder) (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4, 9—1(a)(1)) and armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—3). The armed violence convictions were subsequently vacated. Carvajal was given a 60-year term for the murder and a 30-year term for the attempt (murder) convictions, with the terms to run concurrently. Torres was sentenced to concurrent terms of 50 years for murder and 30 years for the attempt (murder) convictions. They appeal, claiming: (1) the trial court should have severed their trials from that of Angel Loera; (2) they were not proved guilty beyond a reasonable doubt of murder and attempt (murder); (3) the attempt (murder) jury instruction given at their trial was erroneous; and (4) the constructive possession jury instruction given at their trial was erroneous.

The charges in this case arose out of a shooting that occurred at about 10 p.m. on June 3, 1990, on Beach Street in Aurora, Illinois. Defendants, members of the Insane Deuces street gang, shot into a crowd of Latin Kings who had gathered for a party. One person in the crowd died and two others were wounded.

Alex Ramos testified that he was a member of the Latin Kings, which he maintained was a mere loose-knit organization without any hierarchical structure. He stated that his gang and the Insane Deuces were at "war" at the time of the shooting and at the time of trial. He identified defendants and Loera as Insane Deuces. He also stated that he was at the scene just prior to the shooting and that he saw Loera, Torres and a third person at a nearby intersection holding guns and wearing black and gold clothes. He said that Carvajal appeared between two nearby houses on Beach Street and that all four individuals then opened fire on the crowd with automatic and semiautomatic weapons. Ramos further testified that shots came from a car at the other end of the block shortly before defendants began shooting. Also according to Ramos, he had gotten into a fight with Carvajal earlier on the day of the shooting.

Patrick Allen, another Latin King, identified Carvajal as one of the shooters, but said that the gunmen wore black clothing. He also recounted the confrontation between the people in the street and

those in the car from which shots were fired, but described the car's movements differently than did Ramos.

Michael Waters, another member of the Latin Kings, identified Carvajal and Torres as Insane Deuces and claimed that Torres was one of two shooters at the intersection. He stated that Carvajal was the gunman positioned between the houses on Beach Street. He testified that the shooters wore hooded black clothing with the hoods up. He also testified that individuals from a car had fired shots before defendants had begun shooting, but, in contrast to the other occurrence witnesses, testified that one individual had alighted from the car to fire at the crowd.

Fidel Elizondo, a former Latin King, identified Torres as one of two gunmen standing in the intersection. He stated that both shooters wore black clothing with hoods up over their heads. He also testified as to the presence of the car and gunshots from it before defendants opened fire, but described the car's movements differently than some other witnesses.

Frank Ramirez, another Latin King, testified as to the presence of the car and gunfire from the car before the shots fired by defendants. He then identified Torres as one of two gunmen in the intersection and Carvajal as being between two houses on Beach Street, but stated that he did not see Carvajal firing a weapon. He also stated that he did not see the gunmen's clothing.

Robert Saltijeral, who was not a gang member, identified Loera and Torres as being two of three persons standing in the intersection. However, he stated that he did not see anyone shooting.

Al Tiegelmann, an Aurora police officer, testified that he interviewed Loera and that Loera told him that he was with Torres and Carvajal until about 8:30 p.m. on the night of the shooting, at which time he left them and went home.

Scott Wolters, another Aurora policeman, testified that he found two pistols, some gun magazines and a plaque bearing gang graffiti during a search of the house in which Loera lived. A firearms expert subsequently testified that nine spent cartridge casings recovered from the shooting scene were fired from one of the guns found at Loera's house.

The defense offered the testimony of various friends and family members of defendants. These persons provided an alibi for Torres from about noon on the day of the shooting until the next morning, and for Carvajal from about 7 p.m. on the day of the shooting until the next morning.

The jury convicted defendants on all charges. Defendants filed a timely appeal.

## SEVERANCE

First, defendants claim that they were denied a fair trial when their trial was not severed from that of Loera. They claim that Loera's statement to police that he was with defendants at about 8:30 p.m. on the night of the shooting was in direct conflict with their alibi defenses and that this prejudice was exacerbated because Loera did not testify and defendants were thus denied the opportunity to cross-examine him about the statement. Defendants also claim that the joint trial allowed the State to admit against all three defendants the gun found at Loera's house and tied to the shooting scene and that this disparity in the proof required a severance. Defendants allege that the State would not have offered the gun at a trial without Loera, but that the defense would have offered it to deflect suspicion on a third party. The State claims that neither the conflict between defendants' alibi defenses and Loera's statement nor the disparity in the evidence was sufficiently acute to warrant severance.

Generally, defendants indicted together should be tried together unless they can show potential prejudice sufficient to warrant separate trials. (*People v. Bean* (1985), 109 Ill. 2d 80, 92.) However, the mere anticipation of prejudice is not sufficient to obtain a severance; rather, a defendant must state how he will be injured by a joint trial. (*Bean*, 109 Ill. 2d at 92.) A severance is mandatory when codefendants' defenses are so antagonistic that a joint trial would not be a fair one. (*People v. Byron* (1987), 116 Ill. 2d 81, 92.) Moreover, although "[a]ctual hostility between the two defenses is required" (*Bean*, 109 Ill. 2d at 93), there is no requirement that the prejudice be reciprocal as between the defendants. (*Bean*, 109 Ill. 2d at 95.) "*[A]ny* set of circumstances which deprives *a* defendant of a fair trial is sufficient to require severance." (Emphasis in original.) *Bean*, 109 Ill. 2d at 95.

A severance is also appropriate when the State, in a joint trial, introduces out-of-court statements of a nontestifying codefendant that implicate the defendant. (*People v. Wilson* (1987), 161 Ill. App. 3d 995, 1000.) In this instance, the defendant may be denied his constitutional right to confront witnesses against him because he cannot cross-examine the codefendant. *Wilson*, 161 Ill. App. 3d at 1000; see also *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

Further, a great disparity in the evidence against one codefendant may require a severance of his trial from that of another codefendant.

(*People v. Harris* (1990), 198 Ill. App. 3d 1002, 1009.) Defendants here claim that all three of these situations exist in the case at bar.

Before we reach the merits, it is important to note that a trial court has the discretion to grant a motion for severance. (*People v. Olinger* (1986), 112 Ill. 2d 324, 346.) Thus, we review the circuit court's decision under the abuse of discretion standard. "In ruling on the motion for severance the trial judge must make a prediction about the likelihood of prejudice at trial, taking into account the papers presented, the arguments of counsel, and any other knowledge of the case developed from the proceedings." (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541.) Further, a trial court has a duty throughout the trial to order a severance if sufficient prejudice appears. (*Wilson*, 161 Ill. App. 3d at 1000.) Finally, an appellate court reviewing a trial court's decision on a severance motion "looks to the facts and circumstances which existed at the time [the motion] was denied [citation], although subsequent events may illustrate the prejudice which results when the motion is not granted at the earliest point." *People v. Threzzy* (1987), 163 Ill. App. 3d 180, 183.

■ Here, we do not believe that the joint trial denied defendants their right to a fair trial. Specifically, the fact that Loera's statement contradicted the testimony of defendants' alibi witnesses did not render the defenses so antagonistic to warrant a severance. Additionally, the proof against Loera was not so much greater than the proof against defendants that a severance was required.

At trial, an Aurora police officer testified that Loera told him that he (Loera) was with defendants until 8:30 on the night of the shooting. This statement contradicted the testimony of defendants' alibi witnesses, who provided alibis for defendants from points in time much earlier than 8:30 p.m.

Defendants point us to no cases factually similar to the present case, and the cases they cite for general propositions of severance law are distinguishable. In *People v. Bean* (1985), 109 Ill. 2d 80, the supreme court ruled that a severance should have been granted in a murder trial because the codefendant "could only convince the jury of his own innocence by convincing them to convict [the defendant]." (*Bean*, 109 Ill. 2d at 95.) *Bean* is replete with egregious examples of the codefendant's attempts to portray the defendant as the murderer.

Similarly, in *People v. Trass* (1985), 136 Ill. App. 3d 455, the defense of each appealing defendant was that he was merely an onlooker during the robbery of the victim by his codefendants. In *People v. Threzzy* (1987), 163 Ill. App. 3d 180, the codefendant's defense was that the defendant, not the codefendant, was the drug dealer that the

State was after. Further, the *Threzzy* court noted the similarity of that case to *Bean* with regard to the prejudice suffered by the defendant at the hands of his codefendant's counsel. *Threzzy*, 163 Ill. App. 3d at 184.

Here, Loera's statement did not implicate defendants in the shooting. Indeed, since Loera's defense was that he was not at the shooting scene, he could not have stated from personal knowledge that defendants were the shooters. Loera's statement did not even place defendants at the scene at the relevant time. A full hour-and-one-half gap existed between the time Loera's statement places the three defendants together and the time of the shooting. That Loera's statement contradicts alibi testimony is not sufficient to warrant a severance.

We find support for our conclusion in the case of *People v. Bramlett* (1991), 211 Ill. App. 3d 172. In that case, the court held that a codefendant's testimony placing a stolen clock in the defendant's car hours before the burglary in which the clock allegedly was taken, and for which the defendant was on trial, did not render the codefendant's defense so antagonistic to the defendant's defense of innocence to require a severance. (*Bramlett*, 211 Ill. App. 3d at 178-80.) The court noted that the codefendant's testimony did not implicate the defendant in the burglary. (*Bramlett*, 211 Ill. App. 3d at 179.) Such is the case here. The *Bramlett* court also stressed that the defendant's criminal involvement was established without reference to the clock. (*Bramlett*, 211 Ill. App. 3d at 179.) Again, in this case, various witnesses identified defendants as the gunmen. Although the *Bramlett* court also noted that the codefendant's other testimony was actually helpful to the defendant (*Bramlett*, 211 Ill. App. 3d at 179), we do not find that point to be determinative.

The defenses of Loera and defendants here were not sufficiently antagonistic to require a severance. As the *Bramlett* court cautioned, "care must be taken in severance cases to ensure that the nature of the defenses are truly inconsistent." *Bramlett*, 211 Ill. App. 3d at 179-80.

Further, the fact that defendants could not cross-examine Loera about his statement does not alter the result, as defendants were not denied their constitutional right to confront witnesses against them. Under the United States Supreme Court's opinion in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the admission in a joint trial of an out-of-court statement by a codefendant implicating the defendant in the crime denies the defendant his right to confront witnesses against him. Here, however, Loera's

statement did not implicate defendants in the shooting, even though the statement contradicted the testimony of defendants' alibi witnesses.

Similar to this case are the cases of *People v. Boclaire* (1981), 95 Ill. App. 3d 536, and *People v. Hudson* (1970), 46 Ill. 2d 177. In *Boclaire*, a police investigator testified at the defendant's trial that a codefendant had told him at the time of all the defendants' arrest for murder that a rifle was in the trunk of the car the codefendant was driving. The investigator's testimony was held not to violate the rule in *Bruton* because the codefendant's statement did not implicate the defendant. *Boclaire*, 95 Ill. App. 3d at 539.

In *Hudson*, an informant who had participated in the crime testified that, after he had turned State's evidence, the codefendant tried jointly with the defendant had called him a "stool pigeon." (*Hudson*, 46 Ill. 2d at 196.) The informant also testified that a jailor holding the defendant and the codefendant had told him that "the boys they got back there are mad at you." (*Hudson*, 46 Ill. 2d at 196.) The supreme court held that the testimony did not violate the *Bruton* rule because it did not "readily lead to the conclusion" that the defendant was guilty. (*Hudson*, 46 Ill. 2d at 196.) Likewise, in this case, Loera's statement does not directly implicate defendants in the shooting, and, thus, defendants were not denied their right to confrontation as a result of their inability to cross-examine Loera.

Next, defendants claim that a severance was required due to the disparity in the amount of proof against them, as opposed to that against Loera. A gun found in the house in which Loera lived with his parents and siblings matched shells found at the shooting scene. Defendants claim that the joint trial allowed the State to admit the gun against Loera and have the jury connect the gun with defendants also, whereas the admission of the gun in a trial against just defendants would have benefitted the defense.

Although a great disparity in the evidence against codefendants may be sufficient, by itself, to warrant severance (*People v. Harris* (1990), 198 Ill. App. 3d 1002, 1009), a severance on such ground was not required in this case. The admission of the gun did not tilt the evidence so heavily in favor of Loera's guilt that defendants were thereby denied a fair trial. As the State points out, five people placed Torres at the scene of the shooting, four witnesses identified Carvajal as being there, and two witnesses placed Loera at the scene. Defendants and Loera were identified as either shooting or standing in locations from which shots were allegedly fired. Moreover, the jury was instructed that each defendant should be given separate consideration

and that each defendant's case should be decided based on the law and the evidence applicable to him.

This case is not like the case of *People v. Byron* (1987), 116 Ill. 2d 81, in which a severance was required because of the "overwhelming volume" of evidence admitted against the defendant's codefendant only. (116 Ill. 2d at 93.) Further, the disparity in *Byron* was exacerbated by the "bitter antagonism" between the two defendants' defenses. (*Byron*, 116 Ill. 2d at 93.) In this case, we believe the jury "could fairly apply the evidence to the respective defendants." *Byron*, 116 Ill. 2d at 93.

### INSUFFICIENT EVIDENCE

Defendants argue that the inconsistent testimony of rival gang members and those members' acquaintances was insufficient to support their convictions. The State counters that the evidence was sufficient because the witnesses were identifying people they knew and because the area was well lit. The State also argues that, in any event, the jury heard all about the inconsistencies in the testimony, the witnesses' gang affiliations, the tardiness with which the witnesses came forward, and the alleged gang fear in the area of the shooting.

When reviewing a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89; *People v. Fields* (1990), 135 Ill. 2d 18, 40.) Moreover, an identification of a defendant by a single witness is enough to convict if the witness saw the defendant under circumstances allowing for a positive identification. (*Fields*, 135 Ill. 2d at 40-41.) Finally, questions of witness credibility and the weight to be given testimony are for the jury (*People v. Hister* (1975), 60 Ill. 2d 567, 573), and a reviewing court will not substitute its judgment for that of the jury where the evidence is merely conflicting. *People v. Akis* (1976), 63 Ill. 2d 296, 298-99.

■ To be sure, the testimony in the present case is conflicting on a good many points, such as the number of shooters, the manner in which the shooters were dressed, the exact locations from which the shooters fired, and the activities of the car from which shots were fired shortly before the pedestrian shooters opened fire. However, we believe that the conflicting evidence was sufficient to convict. This case is similar to the *Fields* case, in which inconsistent testimony of gang members was enough to convict rival gang members of murder.

(*Fields*, 135 Ill. 2d at 40-49.) As in this case, several of the witnesses in *Fields* delayed in telling the police what they knew about the crime. (*Fields*, 135 Ill. 2d at 41.) Also here, as in *Fields*, several witnesses gave what the defendants characterized as inherently improbable testimony and possessed various reasons to perjure themselves. *Fields*, 135 Ill. 2d at 43-46.

In this case, the jury was informed of all the factors bearing on the credibility of the State's witnesses, and it chose to believe them anyway. We cannot say that the jury's decision is "so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to the defendants' guilt." (*Fields*, 135 Ill. 2d at 49.) Finally, *People v. Hister* (1975), 60 Ill. 2d 567, cited by defendants, is not on point. In *Hister* the supreme court held that conflicting testimony was too inconsistent to uphold murder convictions. However, in that case the witnesses' testimony revealed completely different scenarios as to how, where and under what circumstances the shooting occurred. (*Hister*, 60 Ill. 2d at 570-71.) In contrast, the witnesses in this case generally agreed that a small number of gunmen positioned themselves in the intersection and between some houses and fired at the crowd. Several witnesses identified defendants. We will not disturb the jury's verdict.

### ATTEMPT INSTRUCTION

Defendants argue that their attempt (murder) convictions cannot stand because the jury was not instructed that it had to find that defendants acted with specific intent to kill. The State responds that any error has been waived by defendants' failure to object to the instruction at trial. Defendants counter this argument with the claim that the plain error exception to the general waiver rule applies here. The State then asserts that any error that occurred was harmless because defendants' intent was not at issue and because the prosecutor informed the jury during closing argument that the offense of attempt (murder) required a finding of specific intent to kill.

At trial the jury was instructed as follows:

"A person commits the offense of attempt when he, with intent to commit the offense of murder, does any act which constitutes a substantial step toward the commission of the offense of murder.

The offense attempted need not have been committed." Illinois Pattern Jury Instructions, Criminal, No. 6.05 (2d ed. 1981) (hereinafter IPI Criminal 2d).

"To sustain the charge of attempt, the State must prove the following propositions:

*First*: that the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the commission of the offense of murder; and

*Second*: that the defendant, or one for whose conduct he is legally responsible, did so with intent to commit the offense of murder." IPI Criminal 2d No. 6.07.

"A person commits the offense of first degree murder when he kills an individual without lawful justification if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to that individual or another." IPI Criminal 2d No. 7.01A (Supp. 1989).

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First*: that the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Dennis Evans; and

*Second*: that when the defendant, or one for whose conduct he is legally responsible, did so he knew that his acts created a strong probability of death or great bodily harm to Dennis Evans or another." IPI Criminal 2d No. 7.02A (Supp. 1989).

█ It is now well settled that these instructions are erroneous because they do not particularly instruct the jury that it must find specific intent to kill in order to convict defendants of attempt (murder). (See *People v. Trinkle* (1977), 68 Ill. 2d 198; *People v. Jones* (1979), 81 Ill. 2d 1; *People v. Deason* (1991), 223 Ill. App. 3d 320.) Here, the jury could have convicted defendants of attempt (murder) if it found that defendants acted with knowledge that their acts created a strong probability of death or great bodily harm to the victims.

However, leaving aside the waiver issue, we find that the error was harmless under the circumstances of this case. Here, intent was not at issue (see *Jones*, 81 Ill. 2d at 9-10), as defendants raised alibi defenses. Moreover, that defendants possessed the specific intent to kill is evident from the fact that they fired automatic and semiautomatic weapons into a crowd of rival gang members with whom defendants' gang was at "war."

Our conclusion is supported by cases such as *People v. Mendez* (1991), 221 Ill. App. 3d 868, and *People v. Smith* (1984), 127 Ill. App. 3d 622. In *Mendez*, similar attempt (murder) instructions were given and the court found the error to be harmless since the evidence of the defendant's intent to kill was clear. (*Mendez*, 221 Ill. App. 3d at 876-

77.) The defendant there had fired a gun at a group of rival gang members. Likewise, in *Smith,* similarly incorrect attempt (murder) instructions were found not to present a sufficiently grave error to escape operation of the general rule that a failure to object to allegedly erroneous jury instructions waives the alleged error. (*Smith,* 127 Ill. App. 3d at 633-34.) The court found that the evidence was not closely balanced on the issue of the defendant's state of mind when he attacked the attempt (murder) victim. (*Smith,* 127 Ill. App. 3d at 634.) In *Smith,* the defendant stabbed a presumed witness to the defendant's previous murder with a butcher knife, causing three 6- to 10-inch cuts on the victim's upper body and severing part of the victim's finger.

This case, like *Mendez* and *Smith,* presents a scenario in which the conclusion that defendants acted with the intent to kill is compelled by the evidence. Defendants claim that, had they intended to kill their gang rivals, the carnage would have been much greater, given defendants' use of automatic and semiautomatic weapons. We refuse to engage in such speculation. The error in the attempt (murder) instructions was harmless and defendants' attempt (murder) convictions will stand.

### CONSTRUCTIVE POSSESSION INSTRUCTION

Last, defendants contend that they were denied a fair trial by the trial court's giving of the following constructive possession instruction:

> "Possession may be actual or constructive. A person has actual possession when he has immediate and exclusive control over a thing. A person has constructive possession when he lacks actual possession of a thing but he has both the power and the intention to exercise control over a thing either directly or through another person." IPI Criminal 2d No. 4.16.

Defendants claim that the instruction was not needed since no possession charge was at issue and the State was not required to prove that Loera possessed the gun found in his home in order to use the gun as part of its case against Loera. Defendants accuse the State of requesting the instruction so that the jury would improperly infer that defendants, as well as Loera, constructively possessed the gun. The State argues that the charge was proper because the gun was found in a home shared by Loera and other members of his family and because the gun was admissible against all three defendants.

■ First, it is clear that the gun recovered from Loera's house was admissible against all three defendants, not just Loera. In *People*

v. *Miscichowski* (1986), 143 Ill. App. 3d 646, this court held: "Where there is sufficient evidence to establish that at least one weapon was used in the commission of the offense and that defendant participated in the offense, the weapon may be admitted even though the evidence does not show that defendant himself wielded or possessed it." (143 Ill. App. 3d at 653.) The *Miscichowski* court rejected the defendant's claim that a rifle was not admissible because it was connected only to his codefendant and because there was no evidence showing that the defendant had fired the shot that killed the decedent. The court noted that the evidence placed the defendant in the area of the shooting with a rifle at the time of the shooting. It also stated that it was not necessary to prove that the rifle in question was the one actually fired in order for it to be admissible. (143 Ill. App. 3d at 652.) As in *Miscichowski*, the gun recovered from Loera's house was admissible against Torres and Carvajal because there was sufficient evidence that the gun was used in the crime and that Torres and Carvajal participated in the shooting.

Turning to the constructive possession instruction, we hold that giving the instruction created no error. "[A] jury in a criminal case may be instructed as to any theory of the case that may reasonably be inferred from the facts. [Citation.] The prosecution, as well as the defense, is entitled to appropriate instructions which present its theories of the case, if such theories are supported by the evidence." (*People v. Carlson* (1992), 224 Ill. App. 3d 1034, 1043.) However, a trial court should not give instructions that do not accurately state the law, or that are confusing or misleading. (*People v. Wendt* (1989), 183 Ill. App. 3d 389, 398.) Rather, "[t]he sole function of instructions is to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it." *People v. Gambony* (1948), 402 Ill. 74, 81-82.

When determining the propriety of a single instruction, all the instructions must be reviewed, and it is sufficient if the instructions as a whole fully and fairly announce the applicable law. (*People v. Hartfield* (1985), 137 Ill. App. 3d 679, 689.) Finally, "[t]he test of the correctness or propriety of instructions is not what meaning the ingenuity of counsel can attribute to them, but how and in what sense, under the evidence before them and considering the circumstances of the trial, ordinary men acting as jurors will understand the instructions." *People v. Haas* (1990), 203 Ill. App. 3d 779, 796.

Here, although the constructive possession instruction might not have been essential to the State's case, we do not believe it prejudiced defendants. The instruction certainly helped the jury connect the gun

to Loera, which was important to the State's case and which was supported by the evidence. In addition, the instruction could not have been used by the jury to find that Torres and Carvajal constructively possessed the gun unless there was evidence that Torres and Carvajal had power over Loera with which to exercise control over the gun through Loera. Although there was evidence that Loera, Torres and Carvajal all belonged to the Insane Deuces gang, there was no evidence that defendants occupied a higher rank than did Loera, as would give defendants power over him. We believe that the instructions, as a whole, did not confuse or mislead the jury, and we find no error created by the constructive possession instruction.

For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

Affirmed.

UNVERZAGT and BOWMAN, JJ., concur.