THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSE A. LOERA, Defendant-Appellant.
Second District   No. 2—91—0949

Opinion filed August 30, 1993.

Steven A. Greenberg, Ltd., of Chicago (Steven A. Greenberg, of counsel), for appellant.

David R. Akemann, State's Attorney, of Geneva (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Defendant, Jose Angel Loera, was convicted by a jury in the circuit court of Kane County of one count of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1) (now codified, as amended, at 720 ILCS 5/9—1(a)(1) (West 1992))), two counts of attempt (murder) (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 9—1(a)(1) (now codified, as amended, at 720 ILCS 5/8—4(a), 720 ILCS 5/9—1(a)(1) (West 1992))), and two counts of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))). Defendant was sentenced to 50 years' imprisonment on the murder count and a concurrent term of 30 years' imprisonment on the attempt (murder) counts. The armed violence counts were held to merge with the attempt (murder) counts. Defendant filed a timely appeal.

On appeal, defendant argues that (1) his trial counsel labored under a conflict of interest, prejudicing defendant or, alternatively, denying him the effective assistance of counsel; (2) the trial court should have severed his trial from that of his codefendants; (3) he was not proved guilty beyond a reasonable doubt; (4) the attempt (murder) instruction given to the jury was erroneous and prejudicial; (5) he was denied the right to testify in his own behalf at trial; (6) the trial court should not have allowed a police officer to testify as an expert on gangs; and (7) he was denied the effective assistance of counsel both prior to trial and during his trial.

Defendant was tried jointly with Jorge Carvajal and Brian C. Torres, who were each convicted of charges identical to defendant's charges. We affirmed Carvajal's and Torres' convictions in *People v. Carvajal* (1993), 241 Ill. App. 3d 886.

On June 3, 1990, at about 10 p.m. a shooting occurred on Beach Street in the City of Aurora. A large group of Latin Kings had gathered for a party and were milling about in the street. Three or four gunmen who were allegedly members of the Insane Deuces, a gang which was then at "war" with the Latin Kings, fired into the crowd

using automatic and/or semiautomatic weapons. One person in the crowd died and two others were wounded.

A number of Latin Kings and their acquaintances testified for the State concerning the shooting. The witnesses generally agreed that after a confrontation between the people in the street and a number of people in a passing car, two or three gunmen appeared at the intersection of Beach and Liberty Streets and an additional gunman came out from between two houses on Beach Street. The gunmen opened fire on the crowd.

Alex Ramos, a Latin King, testified that defendant, Torres and a third person were the gunmen at the intersection and that Carvajal was the person who fired from between the houses. Ramos identified defendant, Carvajal and Torres as belonging to the Insane Deuces.

Michael Waters, another Latin King, testified that Torres was one of the men who fired from the intersection and that Carvajal was the person between the houses on Beach Street. He had told police on the night of the shooting that he could identify two of the shooters as Angel Torres and Angel Gonzalez. However, on October 23, 1990, Waters apparently told a prosecutor that he did not actually see Gonzalez at the scene, but had told police on the night of the shooting that Gonzalez was a gunman because he heard Alex Ramos say that "Ucla" was one of the shooters. Waters thought at that time that "Ucla" was Gonzalez' nickname. In fact, "Ucla" is defendant's nickname. Waters also testified at trial regarding his misidentification of Gonzalez and the mix-up with regard to "Ucla's" identity.

Robert Saltijeral, who was not a gang member, testified that seconds before the shooting started he saw defendant, Torres and a third person, Oscar Salgado, wearing dark clothing and walking toward the intersection of Beach and Liberty Streets. As he ran during the shooting, Saltijeral saw those three individuals standing in the intersection where the shooting was coming from. He did not, however, see defendant or the other two men firing a gun.

Al Tiegelmann, an Aurora police officer, testified that he interviewed defendant and that defendant told him that he was with Torres and Carvajal until about 8:30 p.m. on the night of the shooting, at which time he left them and went home.

Scott Wolters, another Aurora policeman, testified that he found two pistols, some gun magazines and a plaque bearing gang grafitti during a search of the house in which defendant lived with his parents and siblings. A firearms expert subsequently testified that nine spent cartridge casings recovered from the shooting scene were fired from one of the guns found at defendant's house.

Torres and Carvajal offered the testimony of various friends and family members. These persons provided an alibi for Torres from about noon on the day of the shooting until the next morning, and for Carvajal from about 7 p.m. on the day of the shooting until the next morning. Defendant's family members testified that defendant was at home from approximately 8:30 p.m. on June 3 until 10:30 p.m., when he was arrested.

### CONFLICT OF INTEREST

Defendant argues that his trial counsel worked under a conflict of interest because, after his trial counsel agreed to represent defendant but before defendant's trial, his trial counsel also agreed to represent Angel Gonzalez on unrelated charges. Angel Gonzalez was the individual who was misidentified as one of the gunmen by Michael Waters after Waters heard Alex Ramos say that one of the shooters was "Ucla." Defendant asserts that a *per se* conflict existed, resulting in presumed prejudice to defendant and requiring automatic reversal.

According to our supreme court, a *per se* conflict exists when "certain facts about a defense attorney's status *** engender, *by themselves*, a disabling conflict." (Emphasis in original.) (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 14.) The court noted that *per se* conflict cases had been limited to cases in which defense counsel had a prior or contemporaneous association with either the prosecution or the victim. (*Spreitzer*, 123 Ill. 2d at 14.) Absent a waiver of the conflict by the defendant, treating these kinds of conflicts as *per se* prejudicial is warranted because, in these types of cases, the defense attorney has a tie to some person or entity that would benefit from a verdict unfavorable to the defendant. (*Spreitzer*, 123 Ill. 2d at 16.) *Per se* conflicts present problems of possible subliminal effects on defense counsel's conduct and the likelihood of later charges against the attorney of less than faithful representation. *Spreitzer*, 123 Ill. 2d at 16-17.

Here, trial counsel's later representation of Angel Gonzalez did not give rise to a *per se* conflict of interest. Gonzalez was identified as a gunman by only one witness, Michael Waters. Further, Waters admitted, both before trial and at trial, that the identification was a mistake. Although Gonzalez apparently was listed as a suspect on a police report, he was not considered a suspect by the State's Attorney's office after Waters explained his mistaken assumption. Because no other witness ever mentioned Gonzalez, it is apparent that Gonzalez' name appeared on the police report because Waters told police at the scene of the shooting that Gonzalez was one of the gunmen.

■ Gonzalez was not a witness in this case, was not a victim and was not a serious suspect. He stood to gain no advantage from Loera's conviction, and defendant's claim that Gonzalez could be a prosecution target if defendant was acquitted is pure speculation, unsupported by any evidence in the record. Thus, trial counsel here did not labor under a *per se* conflict of interest during the trial of this case.

Defendant next alleges that trial counsel's failure to cross-examine Waters or Ramos about the identification of Gonzalez showed that trial counsel was influenced by his conflict of interest to the prejudice of defendant. Defendant argues that he was consequently denied the effective assistance of counsel.

Again, in *Spreitzer*, our supreme court explained the rules pertaining to a second type of alleged conflict, generally arising when there is joint representation of codefendants. (*Spreitzer*, 123 Ill. 2d at 17.) In these cases, if the trial judge is notified of the alleged conflict early in the proceedings, he has a duty to alleviate the situation, and, if he does not, reversal is warranted even without a showing that the purported conflict affected the attorney's performance. (*Spreitzer*, 123 Ill. 2d at 18.) However, if the trial judge is not timely notified of the alleged conflict, then a defendant cannot obtain reversal unless he shows that " 'an actual conflict of interest adversely affected' counsel's performance." *Spreitzer*, 123 Ill. 2d at 18, quoting *Cuyler v. Sullivan* (1980), 446 U.S. 335, 350, 64 L. Ed. 2d 333, 348, 100 S. Ct. 1708, 1719.

The rules relating to this second type of alleged conflict do not pertain to the trial proceedings in this case. Not only was there no joint representation here, but also the initial misidentification of one of trial counsel's future clients as a gunman does not even rise to the level of a potential conflict given the resolution of the misidentification.

Moreover, defendant's claims of actual prejudice, that trial counsel should have cross-examined Ramos and Waters about the misidentification, are without merit. First, defendant misstates the record when he implies that Ramos identified Gonzalez. Ramos clearly identified "Ucla" and knew "Ucla" to be Loera. Second, it would seem to be a better trial strategy to allow Waters to testify concerning his identification of Gonzalez, and then argue in closing about the possibility of an uncharged gunman or a misidentification of Loera, than to ask Waters about Gonzalez and open the door to Waters' tidy explanation bolstering Ramos' identification of Loera. The record in this case does

not establish that the alleged conflict in any way affected trial counsel's performance at trial.

Defendant next argues that trial counsel's comment at a hearing on defendant's motion for a new trial, that he could not "point [the] finger" at Gonzalez because Gonzalez was also a client of trial counsel, shows that trial counsel was aware of the conflict and used it to defendant's detriment. Defendant again misstates the record.

On March 19, 1991, after the trial in this case, defendant filed a *pro se* motion titled "Motion for Arrest in Judgment and Motion for a New Trial" (motion). In the motion defendant alleged that he had told trial counsel that he knew who had actually committed the crime of which defendant was convicted (presumably Angel Gonzalez) and that he wanted to testify to this fact. The motion further alleged that trial counsel told defendant to remain silent until he appealed because trial counsel was currently representing Gonzalez and another man on unrelated charges.

However, at the hearing on the motion, defendant admitted that he had not informed trial counsel until March 8, 1991, after his trial, that he knew who the real gunman was. It was at this point that trial counsel told defendant that defendant's allegation presented a conflict of interest. On April 12, 1991, a stipulation was entered whereby defendant consented to the withdrawal of his trial counsel and the entry of an appearance by new counsel. Defendant's new counsel then handled the post-trial work in defendant's case.

It is thus clear that any legitimate conflict of interest did not arise until after defendant's trial and that the conflict was quickly remedied by the substitution of counsel. In sum, we find that defendant is not entitled to any relief on his claim of a conflict of interest on the part of his trial counsel.

## SEVERANCE

Defendant's second claim is that the trial court erred in refusing to sever his trial from that of Carvajal and Torres. Defendant argues that severance was required because his statement to police, that he had been with Carvajal and Torres until 8:30 p.m. on the night of the shooting, conflicted with alibis presented by Carvajal and Torres, which had them in the company of others from points much earlier in time until after the shooting had occurred. Defendant also argues that he was denied his right to confront witnesses against him because he could not call Carvajal or Torres to impeach the police officer's testimony that the three defendants were together at 8:30 p.m. Finally, defendant argues that severance was required because both defend-

ant's trial counsel and the attorney representing Carvajal and Torres told the trial judge that each would be attempting to blame the other defendant or defendants to the exclusion of his client or clients.

We addressed and rejected this same argument in *Carvajal* (241 Ill. App. 3d at 890-94). The claim is similarly without merit in this case.

In *Carvajal* we noted that a severance is required when any set of circumstances deprives a defendant of a fair trial. (*Carvajal*, 241 Ill. App. 3d at 890, citing *People v. Bean* (1985), 109 Ill. 2d 80, 95.) For example, a court must grant a severance when codefendants' defenses are so antagonistic that a joint trial could not be a fair one. (*People v. Byron* (1987), 116 Ill. 2d 81, 92.) A trial court's decision to grant or deny a severance is reviewed under the abuse-of-discretion standard. See *People v. Olinger* (1986), 112 Ill. 2d 324, 346.

■ The inconsistency of defendant's statement with Torres' and Carvajal's alibis did not render the three individuals' defenses so antagonistic as to deny any of the three a fair trial. Defendant's statement did not implicate Torres or Carvajal in the shooting, or even place any of the three at the scene at the relevant time. Thus, the court properly refused to grant a severance in this case. See *People v. Bramlett* (1991), 211 Ill. App. 3d 172.

Further, as we explained in *Carvajal* with regard to an almost identical claim, the fact that defendant was not able to call Carvajal or Torres to the stand to impeach the police officer's testimony did not deny defendant his right to confrontation. Neither defendant's statement nor Carvajal's or Torres' alibi implicated the others in the offense. Under the law in this State, it is the admission in a joint trial of a codefendant's out-of-court statement implicating the defendant in the crime that denies the defendant his right to confrontation. (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) No such situation exists in the case at bar, and defendant was not deprived of his right to confront witnesses against him.

Our conclusion is supported by the cases of *People v. Boclaire* (1981), 95 Ill. App. 3d 536, and *People v. Hudson* (1970), 46 Ill. 2d 177. In *Boclaire*, a police investigator testified at the defendant's trial that a codefendant had told him at the time of all the defendants' arrests for murder that a rifle was in the trunk of the car the codefendant was driving. The investigator's testimony was held not to violate the rule in *Bruton* because the codefendant's statement did not implicate the defendant. *Boclaire*, 95 Ill. App. 3d at 539.

In *Hudson*, an informant who had participated in the crime testified that, after he had turned State's evidence, the codefendant tried

jointly with the defendant had called him a "stool pigeon." (*Hudson*, 46 Ill. 2d at 196.) The informant also testified that a jailor holding the defendant and the codefendant had told him that "the boys they got back there are mad at you." (*Hudson*, 46 Ill. 2d at 196.) The supreme court held that the testimony did not violate the *Bruton* rule because it did not "readily lead to the conclusion" that the defendant was guilty. (*Hudson*, 46 Ill. 2d at 196.) Likewise, in this case, no statement attributable to any of the three defendants directly implicates the others in the shooting, and, thus, defendant was not denied his right to confrontation as a result of his inability to examine Carvajal or Torres.

Finally, the fact that the attorneys for defendant, Carvajal and Torres attempted to argue that the evidence presented was insufficient to convict their client or clients but possibly enough to convict the other defendants did not require a severance. Again, no defendant did, or could consistent with an alibi defense, say from personal knowledge that the other two individuals were the actual perpetrators. The trial transcript does not show an antagonism among the three defendants sufficiently acute to require a severance. This is not a case like *People v. Bean* (1985), 109 Ill. 2d 80, *People v. Trass* (1985), 136 Ill. App. 3d 455, or *People v. Threzzy* (1987), 163 Ill. App. 3d 180, in which severances were mandated because of the accusations of guilt maintained by one or both defendants at the other. In *Bean*, the supreme court ruled that a severance should have been granted in a murder trial because the codefendant "could only convince the jury of his own innocence by convincing them to convict [the defendant]." (*Bean*, 109 Ill. 2d at 95.) *Bean* is replete with egregious examples of the codefendant's attempts to portray the defendant as the murderer.

Similarly, in *Trass*, the defense of each appealing defendant was that he was merely an onlooker during the robbery of the victim by his codefendants. In *Threzzy*, the codefendant's defense was that the defendant, not the codefendant, was the drug dealer that the State was after. Further, the *Threzzy* court noted the similarity of that case to *Bean* with regard to the prejudice suffered by the defendant at the hands of his codefendant's counsel. *Threzzy*, 163 Ill. App. 3d at 184.

While the attorneys in this case stated that they would point the finger of guilt at their client's or clients' codefendants, neither attorney made good on his threat in any meaningful way at trial. The defendant's trial was properly joined with that of his codefendants.

## SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence presented at trial was insufficient to convict him of the charged offenses because only one witness said he saw defendant shooting a gun, the testimony of the State's witnesses was inconsistent, and the State's witnesses were unsavory characters who had a motive to lie. Additionally, defendant claims that the gun found in his parents' house and tied to the scene of the shooting is not compelling evidence of guilt. The State asserts that the jury knew all about the witnesses' various credibility weaknesses and that the evidence is not so weak as to warrant rejecting the jury's decision.

A jury's verdict in a criminal case will not be overturned unless, viewing the evidence in the light most favorable to the State, no rational jury could have found the elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89; *People v. Fields* (1990), 135 Ill. 2d 18, 40.) Moreover, the jury is the proper entity to consider witness credibility and the weight to be accorded various pieces of evidence. *People v. Hister* (1975), 60 Ill. 2d 567, 573.

■ As we noted in *Carvajal*, the testimony in this case contained conflicts regarding the number of shooters, what the shooters wore, the kind of guns they fired, and the locations from which they fired. However, we believe the following evidence is sufficient to convict. Alex Ramos, who knew defendant, identified him as one of the gunmen who fired from the intersection of Beach and Liberty Streets. Robert Saltijeral, who also knew defendant, testified that only seconds before the shooting began he saw defendant, Torres and another person walking toward the intersection from which shots were then fired. An Aurora policeman testified that nine spent cartridge casings recovered from the shooting scene were fired from a gun recovered from defendant's parents' house, where defendant resided.

The cases cited by defendant in support of his claim do not sway us. For example, in *People v. Kilgore* (1974), 59 Ill. 2d 173, while one person identified Kilgore as the man running from a shooting scene, the only eyewitness to the shooting testified that Kilgore was not the gunman. Both men knew Kilgore. (*Kilgore*, 59 Ill. 2d at 177.) Further, no other witness identified Kilgore, and four witnesses stated that the person they saw at the scene had a substantially different hairstyle than did Kilgore on the day of the shooting. *Kilgore*, 59 Ill. 2d at 177-78.

In *People v. Pellegrino* (1964), 30 Ill. 2d 331, only two persons could identify Pellegrino as beating the victim. One was a prostitute who was beaten and stunned at the time of the offense and who had changed her story without explanation to accuse three different men of the beating. The other was a woman who was in the middle of a seven-week "drunk" at the time of the crime and who, at that time, could not walk five feet without holding on to a wall. (*Pellegrino*, 30 Ill. 2d at 334.) In *People v. Carter* (1974), 19 Ill. App. 3d 21 (questioned in *People v. Wehmeyer* (1987), 155 Ill. App. 3d 931, 944), the State's murder case against Carter hinged on his statement imploring his cohort to shoot the victim. However, the victim's brothers, who were present at the scene, did not mention defendant's statement to the police and one brother testified before the grand jury that the attackers said nothing before the shooting. *Carter*, 19 Ill. App. 3d at 23.

In *People v. Bartley* (1962), 25 Ill. 2d 175, the only eyewitness to a shooting could not identify Bartley and admitted that he had previously told an investigator that Bartley was not the man he had seen with a gun. (*Bartley*, 25 Ill. 2d at 180.) The remainder of the State's evidence was circumstantial, and much of it was given by a woman who delayed nine years in telling her story to the police. (*Bartley*, 25 Ill. 2d at 180-81.) Finally, in *People v. Charleston* (1970), 47 Ill. 2d 19, the victim of an attempted rape did not tell police until six days after she reported the attack that she knew Charleston, knew his name and that he was a friend of her husband. (*Charleston*, 47 Ill. 2d at 21-22.) The victim also testified that she had never seen Charleston with her husband or talking to her husband, but did not deny testimony that she, her husband, Charleston and his fiancee all had drinks together approximately three months before the attack. Further, Charleston and two others testified that Charleston was somewhere else when the attack allegedly occurred. *Charleston*, 47 Ill. 2d at 21-22.

The evidence in this case is much stronger than the evidence presented in *Kilgore, Pellegrino, Carter, Bartley* or *Charleston*. As we noted in *Carvajal*, the evidence here is more like that presented in *People v. Fields* (1990), 135 Ill. 2d 18, in which inconsistent testimony of gang members was sufficient to convict rival gang members of murder. (*Fields*, 135 Ill. 2d at 40-49.) In this case, as in *Fields*, State witnesses delayed in coming forward with their stories, gave what the defense called improbable testimony, and had reasons to be untruthful on the stand. *Fields*, 135 Ill. 2d at 41, 43-46.

Here, the jury was informed of all the factors bearing on the State's witnesses' credibility and we will not disturb its decision to be-

lieve them in spite of perceived credibility problems. The jury's verdict is not "so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to the [defendant's] guilt." *Fields*, 135 Ill. 2d at 49.

## ATTEMPT INSTRUCTION

Defendant argues that his attempt (murder) convictions cannot stand because the jury was not instructed that it had to find that defendant acted with specific intent to kill. The State responds that any error has been waived by defendant's failure to object to the instruction at trial. Defendant then asserts that the plain error exception to the general waiver rule applies here. The State counters with the argument that any error that occurred was harmless because defendant's intent was apparent from the facts and because the prosecutor informed the jury during closing argument that the offense of attempt (murder) required a finding of specific intent to kill. We rejected an identical claim by the defendants in *Carvajal* (241 Ill. App. 3d at 895-97), under identical factual circumstances, and we reject it here for the same reasons.

At trial the jury was instructed as follows:

"A person commits the offense of attempt when he, with intent to commit the offense of murder, does any act which constitutes a substantial step toward the commission of the offense of murder.

The offense attempted need not have been committed." Illinois Pattern Jury Instructions, Criminal, No. 6.05 (2d ed. 1981) (hereinafter IPI Criminal 2d).

"To sustain the charge of attempt, the State must prove the following propositions:

First: that the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the commission of the offense of murder; and,

Second: that the defendant, or one for whose conduct he is legally responsible, did so with intent to commit the offense of murder." See IPI Criminal 2d No. 6.07.

"A person commits the offense of first degree murder when he kills an individual without lawful justification if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to that individual or another." See IPI Criminal 2d No. 7.01A (Supp. 1989).

"To sustain the charge of first degree murder, the State must prove the following propositions:

First: that the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Dennis Evans and;

Second: that when the defendant, or one for whose conduct he is legally responsible, did so he knew that his acts created a strong probability of death or great bodily harm to Dennis Evans or another." See IPI Criminal 2d No. 7.02A (Supp. 1989).

It is now well settled that these instructions are erroneous because they do not particularly instruct the jury that it must find specific intent to kill in order to convict a defendant of attempt (murder). (See *People v. Trinkle* (1977), 68 Ill. 2d 198; *People v. Jones* (1979), 81 Ill. 2d 1; *People v. Deason* (1991), 223 Ill. App. 3d 320.) Because of this instruction, the jury could have convicted defendant of attempt (murder) if it found that defendant acted with knowledge that his acts created a strong probability of death or great bodily harm to the victims.

■ However, leaving aside the waiver issue, we find that the error was harmless under the circumstances of this case. That defendant possessed the specific intent to kill is evident from the fact that he fired an automatic or semiautomatic weapon into a crowd of rival gang members with whom defendant's gang was at "war."

The cases of *People v. Mendez* (1991), 221 Ill. App. 3d 868, and *People v. Smith* (1984), 127 Ill. App. 3d 622, buttress our determination. In *Mendez*, similar attempt (murder) instructions were given and the court found the error to be harmless since the evidence of the defendant's intent to kill was clear. (*Mendez*, 221 Ill. App. 3d at 876-77.) The defendant there had fired a gun at a group of rival gang members. Likewise, in *Smith*, similarly incorrect attempt (murder) instructions were found not to present a sufficiently grave error to escape operation of the general rule that a failure to object to allegedly erroneous jury instructions waives the alleged error. (*Smith*, 127 Ill. App. 3d at 633-34.) The court found that the evidence was not closely balanced on the issue of the defendant's state of mind when he attacked the attempt (murder) victim. (*Smith*, 127 Ill. App. 3d at 634.) In *Smith*, the defendant stabbed a presumed witness to the defendant's previous murder with a butcher knife, causing three, 6- to 10-inch cuts on the victim's upper body and severing part of the victim's finger.

This case, like *Mendez* and *Smith,* presents a scenario in which the conclusion that defendant acted with the intent to kill is compelled by the evidence. It is clear that defendant took part in a savage surprise attack, using powerful and deadly weapons, on persons who had drawn the wrath of defendant's gang. The error in the attempt (murder) instructions was harmless, and defendant's attempt (murder) convictions will stand.

### RIGHT TO TESTIFY

Defendant argues that he was denied his fundamental right to testify in his own behalf when his trial counsel improperly convinced him to remain silent. Defendant bases his argument on a paragraph in his *pro se* post-trial motion, which stated:

"Defendant informed [trial counsel] that he was aware of who actually committed the offenses of which defendant has been now tried and convicted. The defendant also told [trial counsel] he desired to testify to these facts. [Trial counsel] advised defendant that it would be best to remain silent until such time as he appealed. When Defendant questioned as to why, [trial counsel] stated there would be a conflict of interest because he was now representing Angel Gonsales [*sic*] and Jose Jesus Diosdado on unrelated cases."

At a hearing on this motion held on March 20, 1991, defendant admitted that he had not told his trial counsel that he ostensibly knew the actual identity of one of the gunmen until March 8, 1991, after his trial. The State thus claims that defendant's allegation that he was discouraged from testifying refers not to testifying at trial, but to testifying after trial. Defendant counters that we should not speculate as to the time frame encompassed by his allegation.

A defendant has a fundamental right to testify in his or her own behalf at trial. (*People v. Campbell* (1984), 129 Ill. App. 3d 819, 821.) Only the defendant may waive this right; it is not a strategic or tactical decision left to counsel. *People v. Dredge* (1986), 148 Ill. App. 3d 911, 913.

Examining defendant's *pro se* motion and the transcript of the hearing on that motion, it is clear that defendant is not referring to testimony at trial. First, defendant admitted that he "informed [trial counsel] that he was aware of who actually committed the offenses" after his trial, on March 8, 1991. Second, the very next sentence of the *pro se* motion, stating that "defendant *also* told [trial counsel] he desired to testify to these facts" (emphasis added), makes it clear that defendant spoke to trial counsel about testifying to the

real perpetrator's identity during or after the March 8 conversation. Logically, defendant could only have told trial counsel that he wanted to testify as to the gunman's identity, and have been discouraged from doing so by trial counsel because the identity gave rise to a conflict, after telling trial counsel of the gunman's identity. The alleged identity of the gunman was disclosed to trial counsel only after defendant's trial.

Moreover, defendant was given an opportunity to explain his allegations at the hearing on his motion. At that hearing, defendant stated that when he wrote his motion, he "kind of made some things up." Defendant affirmed that, to his knowledge, his trial counsel did not know of defendant's allegations during defendant's trial. Thus, defendant's claim that he was deprived of his right to testify in his own behalf plainly appears to concern post-trial proceedings rather than defendant's trial itself. Defendant was given an opportunity to flesh out his claim at the hearing and, instead, he explained away any merit it had. He is not entitled to relief on this claim.

### EXPERT TESTIMONY

Defendant next objects to the fact that the trial judge allowed Aurora police task force investigator Michael Langston to testify as an expert on gangs in Aurora. Defendant argues that Langston was not disclosed to the defense in compliance with Supreme Court Rule 220 (134 Ill. 2d R. 220), that Langston's testimony amounted to inadmissible "other crimes" evidence, and that Langston's testimony was cumulative of other witnesses' testimony.

The State responds that the Rule 220 issue is waived because the defense never objected to the testimony on the basis of a violation of Rule 220. Even if the issue has not been waived, the State argues, defendant was not prejudiced. The State also claims that the testimony was admissible to explain the structure of the Latin Kings and the Insane Deuces and to show that defendant and his codefendants were members of the Insane Deuces.

First, we note that Supreme Court Rule 220 is applicable only to civil proceedings. Supreme Court Rule 412(a)(iv) (134 Ill. 2d R. 412(a)(iv)) governs the disclosure of experts in criminal proceedings. At any rate, defendant's first argument is waived because he did not object at trial or in his post-trial motion to the State's failure to disclose Langston's status as an expert witness. *People v. Steffens* (1991), 208 Ill. App. 3d 252, 262-63; see also *Yowell v. Ringer* (1991), 217 Ill. App. 3d 353, 362 (waiver for failure to object at trial on grounds of Rule 220 disclosure violation).

Second, we find that Langston's testimony was properly admitted. Both defendant and the State cite *People v. Jackson* (1986), 145 Ill. App. 3d 626, on this issue, the State championing it and defendant distinguishing it. While *Jackson* is distinguishable on minor points, it is persuasive.

In *Jackson*, a Chicago police officer was allowed to testify as an expert concerning the defendant's membership in a street gang. The court on appeal explained that the testimony was properly admitted because (1) the officer's testimony qualified as expert opinion, (2) it was relevant, and (3) the testimony's prejudicial effect did not outweigh its probative value. (*Jackson*, 145 Ill. App. 3d at 633-35.) Langston's testimony meets these three criteria.

Whether an individual is qualified to testify as an expert is a question within the discretion of the trial court. (*People v. Calderon* (1981), 98 Ill. App. 3d 657, 661.) "Generally, an expert witness is qualified if, because of his skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person." *Jackson*, 145 Ill. App. 3d at 633.

Investigator Langston had worked with the gang task force for two years before he testified at defendant's trial. He had attended training seminars on gangs, taught classes to police officers on the subject of gangs, and twice testified as an expert on gangs. He received information on gangs in Aurora from fellow police officers, informants, arrestees and citizens. He also undertook surveillance of gang activities on over 200 occasions.

In *Jackson*, the police officer who testified as an expert on gangs had investigated gangs for five years and had infiltrated the gang. He had received his information from observation and from arrestees and citizens. He had also investigated and verified the information he received. (*Jackson*, 145 Ill. App. 3d at 634.) While the officer in *Jackson* had more extensive experience than did Langston, it does not follow that Langston was thus unqualified. Indeed, we believe Langston's qualifications were sufficient to establish his expertise on the subject of gangs in Aurora. Our decision is supported by *People v. Ayala* (1990), 208 Ill. App. 3d 586, in which a police officer with two years' experience investigating gangs in the relevant area was held to have been properly qualified to give expert testimony on gangs. *Ayala*, 208 Ill. App. 3d at 593-94.

At issue next is whether Langston's testimony was relevant. It unquestionably was. At the least, Langston's testimony that defendant and his codefendants were members of the Insane Deuces and that the Insane Deuces and the Latin Kings were at "war" was rele-

vant for the purpose of establishing a motive for the shooting. See *Ayala*, 208 Ill. App. 3d at 592-93.

Next, we must decide whether Langston's testimony was more prejudicial than probative. Defendant claims that Langston's testimony was cumulative of the testimony of the several Latin Kings who testified and that Langston's statements concerning criminal trouble in which Aurora gangs were involved amounted to inadmissible evidence of other crimes.

Although portions of Langston's testimony, that concerning gang signs and colors, were cumulative of other witnesses' testimony, much of Langston's testimony was not. Langston opined that defendant was an Insane Deuce based on Langston's observation of defendant wearing gang colors, "throwing" gang signs, frequenting areas controlled by the Insane Deuces, and, most importantly, possessing a plaque exhibiting his name along with Insane Deuces insignia. His opinion also came from conversations with defendant. It was important to establish defendant's gang ties in order to supply the jury with a motive for the crime. The other witnesses who identified defendant as an Insane Deuce did not have the same type of knowledge that Langston did to back up their characterization of defendant. We thus reject defendant's claim that Langston's testimony was cumulative and therefore unnecessary.

We also reject defendant's argument that Langston's testimony constituted improper evidence of other crimes. When asked if there was a "close relationship" between the Aurora police and Aurora gangs, Langston said that there was, "[d]ue to the complaints that we have from citizens in various areas of the town in reference to the gang members being involved in criminal activity." We do not believe that the above statement, even combined with the remainder of Langston's testimony, the general thrust of which was that gangs in general are criminal enterprises, crossed the line into evidence of other crimes.

"Evidence which suggests that the defendant committed crimes other than the one charged generally is inadmissible, unless relevant to some issue in the case." (*People v. Herrett* (1990), 137 Ill. 2d 195, 207.) Arguably, evidence that defendant was a gang member and that gangs were generally involved in criminal activity could suggest that defendant committed other crimes. However, Langston never mentioned defendant in connection with any specific instances of criminal activity. Further, Langston's use of the vague phrase "criminal activity" is not overly prejudicial since it plainly encompasses minor criminal infractions. Finally, Aurora gangs' criminal involvement justified

police surveillance, which helped explain Langston's qualifications as a gang expert.

We believe that even if Langston's testimony about Aurora gangs' involvement in criminal activity was improper, any prejudice is too speculative to support a reversal. A similar result was reached in *Herrett*. There, our supreme court noted that, even if it was improper for a police officer to testify that the defendant had told him that he could not be scared into going to prison because "he knew about prison," any prejudice to the defendant was too conjectural to justify a reversal. (*Herrett*, 137 Ill. 2d at 207.) The remarks at issue here and in *Herrett* are comparably amorphous. We will not reverse defendant's convictions based on Langston's testimony.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant argues that he was denied his right to the effective assistance of counsel both before and during his trial. He cites six examples of inadequate representation: (1) failure to prepare and present a proper *Franks* motion; (2) inadequate investigation; (3) failure to preserve errors by making offers of proof; (4) unfamiliarity with the rules governing jury selection; (5) enhancement of the State's case by eliciting testimony favorable to the prosecution; and (6) failure to strike improper or inadmissible testimony.

Defendant also argues that his claim cannot be fully evaluated by this court without our consideration of police reports tendered by the State during discovery. We previously struck defendant's first brief because he appended these police reports to it and the reports were not contained in the certified record. We will not now disturb that ruling, especially since it strongly appears that defendant wishes to show that Angel Gonzalez was listed as a suspect in one or more reports made after interviews at the scene. We have previously found that Michael Waters' misidentification of Gonzalez is a red herring. Waters' mistake was explained and no one disputed the explanation or identified Gonzalez as being present at the scene. We will not consider the police reports.

When deciding whether a defendant has been denied the effective assistance of counsel, the court must determine whether the attorney's performance fell below an objective standard of reasonableness and whether the defendant was consequently prejudiced. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504.) A defendant is prejudiced when, but for his attorney's errors, there is a reasonable probability that the result of the trial would have been different. (*People v.*

*Barrow* (1989), 133 Ill. 2d 226, 247 (criticized on other grounds in *Freeman v. Lane* (7th Cir. 1992), 962 F.2d 1252, 1260-61).) If no prejudice has been shown by the defendant, the court need not discuss the "objective standard of reasonableness" prong. *People v. Johnson* (1989), 128 Ill. 2d 253, 271.

### 1. *FRANKS* HEARING

Under *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, a trial court, when requested by the defendant, must hold a hearing on the validity of a search warrant when the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit by the affiant, if the allegedly false statement is necessary to the probable cause determination. (*Franks*, 438 U.S. at 155-56, 57 L. Ed. 2d at 672, 98 S. Ct. at 2676.) A defendant attacking a search warrant affidavit must accompany his allegations with an offer of proof, such as affidavits, or explain why it was not furnished. (*Franks*, 438 U.S. at 171, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684.) As stated, no hearing is required if the affidavit still supports a finding of probable cause after the allegedly false material is disregarded. *Franks*, 438 U.S. at 171-72, 57 L. Ed. 2d at 682, 98 S. Ct. at 2684.

Here, defendant's trial counsel did not include any affidavits or other attachments to either his motion to quash the search warrant or his amended motion to quash. Thus, trial counsel did not follow the mandate of *Franks*. The State argues that, nonetheless, defendant was not prejudiced by trial counsel's omission because the search warrant affidavit supported a finding of probable cause even with the allegedly false portions disregarded. We agree.

The search warrant affidavit in this case was prepared by Aurora police officer Marshall E. Gauer. Gauer stated as follows: He was a 20-year veteran of the police department and was currently a member of the gang/burglary task force. He was investigating a shooting that Alex Ramos and Frank Ramirez, who were both eyewitnesses to the offense, told investigators was gang related. Spent ammunition casings matching an Uzi-type weapon had been recovered from the scene. Ramirez had told an investigator that the shootings were done by four Insane Deuces. Gauer knew the arrested suspects to be Insane Deuces, knew defendant and knew where defendant lived. A confidential informant of another officer had informed Gauer that, three weeks earlier, the informant had seen two Uzis being stored at defendant's house by defendant and his brother. Gauer had been in-

formed by the other officer that the informant had provided reliable information in the past to the other officer which had resulted in the arrest of a gang member on various charges. Ramos had told an investigator that defendant had possessed an Uzi during the commission of the offense. Gauer had reviewed police reports made about the crime and had learned from Jose Salgado that the four suspects arrested were Insane Deuces and that they had fired at the victims in this case.

Before the trial court, trial counsel argued that the portion of the affidavit stating that Salgado had said that the suspects were Insane Deuces and had fired at the victims was a lie. He also argued that Ramirez's identification was not credible because he got his information secondhand. Finally, trial counsel claimed that there was an insufficient basis on which to conclude that the confidential informant was reliable and his or her information credible.

■ Even without Salgado's and Ramirez's statements, the affidavit supports a finding of probable cause. With the exception of the comment that the arrested suspects were Insane Deuces, which was known by Gauer, both Ramirez's and Salgado's statements echoed information provided by Ramos. Striking the statements of Ramirez and Salgado, the affidavit still shows that defendant shot at members of another gang with an Uzi, that shell casings at the scene could have come from an Uzi, and that an informant had seen defendant storing two Uzis at his house three weeks prior to the shooting. This information gives rise to probable cause to search defendant's house for Uzi-type weapons. (See *People v. Fowler* (1991), 222 Ill. App. 3d 157, 162 ("Probable cause for the issuance of a search warrant exists if the facts set forth in an affidavit would cause a reasonable person to believe a crime has been committed and evidence of that crime is in the place to be searched").) Thus, defendant was not prejudiced by trial counsel's actions with regard to the statements of Ramirez and Salgado, and defendant has no viable ineffective assistance of counsel claim in relation thereto.

Turning to the confidential informant, we believe the affidavit provides sufficient proof that he or she was adequately reliable and his or her information credible. First, the informant had seen, not heard about, two Uzis being stored at defendant's residence. (See *People v. Seats* (1984), 121 Ill. App. 3d 637, 643.) Second, defendant's address as reported by the informant was confirmed by police. Third, the informant had given information to another officer in the past which had resulted in an arrest on a number of charges. While the informant had not attained the track record of the informant in *Peo-*

*ple v. Tovar* (1988), 169 Ill. App. 3d 986, 993, who had supplied information to police on three prior occasions, we do not believe that the informant's sole prior aid to police in this case is determinative on the issue of reliability and credibility. (See *People v. Exline* (1983), 98 Ill. 2d 150 (informant's credibility established through controlled drug buys with no mention of any prior information provided to police).) Because we find that the informant in this case was shown to be reliable and his or her information credible, defendant was not prejudiced by his trial counsel's failure to append attachments to his motions to quash the search warrant.

On appeal, defendant argues that his trial counsel should have attacked as conclusory the portion of the affidavit reciting the informant's information and his failure to do so shows ineffective assistance. We disagree. "[T]he sufficiency of [a search warrant affidavit] does not rest on whether each segment is complete in itself but whether the [affidavit], considered as a whole, adequately establishes that there was 'a fair probability that *** evidence of a crime [would] be found in a particular place.' " (*People v. Gacy* (1984), 103 Ill. 2d 1, 22, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332.) The information supplied by the informant could have been better detailed in the affidavit. However, the rather summary nature of the affidavit segment reciting the informant's observations does not render the affidavit, as a whole, conclusory. (See *Gacy*, 103 Ill. 2d at 22-23.) Defendant was not denied the effective assistance of counsel due to his trial counsel's failure to attack the informant portion of the search warrant affidavit as conclusory.

### 2. FAILURE TO INVESTIGATE

Defendant argues that his trial counsel rendered ineffective assistance because he failed to properly investigate the facts of the offense or interview witnesses. Defendant points to the alleged conflict resulting from his trial counsel's contemporaneous representation of Angel Gonzalez as showing prejudice. He makes no other showing of prejudice resulting from his trial counsel's actions.

■ We have previously determined that no conflict arose from the contemporaneous representation of defendant and Angel Gonzalez on wholly unrelated charges. Thus, defendant's claim here rests on a faulty foundation. As defendant has not shown any prejudice with regard to his claim of failure to investigate, defendant's ineffective assistance claim fails on this point. *People v. Mitchell* (1992), 238 Ill. App. 3d 1055, 1064-66.

3. FAILURE TO PRESERVE ERROR

Defendant claims that his trial counsel did not provide him with effective assistance because he failed to make even one offer of proof to preserve error when objections to trial counsel's questions were sustained. The State argues that defendant has not shown prejudice.

Defendant cites two instances from the record where he claims his trial counsel should have made an offer of proof. We fail to see any prejudice resulting from trial counsel's actions.

During trial counsel's cross-examination of David Johnston, an Aurora police officer who was on the scene just after the shooting, trial counsel asked him if he had talked with any of the people he recognized at the scene after the night of the shooting. The court sustained an objection that the question called for material beyond the scope of direct examination. Trial counsel made no offer of proof. However, trial counsel had previously got Johnston to admit that he did no investigation at all after the night of the incident and that he was at the scene for only eight minutes.

Defendant also cites a portion of the record regarding trial counsel's cross-examination of Robert Saltijeral. Successful objections were made to trial counsel's attempts to show that Saltijeral, who identified defendant as standing in the location from which shots were being fired, did not speak to the police on the night of the incident to tell them about whom he had seen in the area. Again, after the portion of the record cited by defendant, trial counsel had Saltijeral clearly admit that he never notified the police department that he had information about the shooting. Further, trial counsel also had Saltijeral admit that he never saw defendant shooting a gun.

As the above shows, defendant was not prejudiced by his trial counsel's failure to make an offer of proof on these occasions, the only occasions cited by defendant. Consequently, defendant's claim of ineffective assistance of counsel fails here as well.

4. JURY SELECTION

Defendant argues that his trial counsel's mistaken assumption that he was to be accorded 7 or 10 peremptory challenges, rather than only 5, shows ineffective assistance. A review of the record shows that trial counsel was not under an incorrect assumption while selecting the jury.

Prior to the beginning of *voir dire*, trial counsel argued to the judge that section 115—4(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—4(e) (now 725 ILCS 5/

115—4(e) (West 1992))) allowed him either 7 or 10 peremptory challenges, rather than 5. The trial judge made it clear to trial counsel, however, that he would get only five peremptory challenges. Trial counsel thus knew at the outset the number of challenges with which he could work. When he tendered the jury panel to the court, trial counsel renewed his argument that he should have been entitled to at least six or seven peremptory challenges and stated that he would have struck additional jurors if he had possessed additional challenges. Counsel understood, nonetheless, that he had only five. Defendant was thus not represented by an attorney who picked a jury under a misapprehension as to the number of peremptory challenges he was allowed, as defendant's brief asserts. No ineffective assistance of counsel occurred at jury selection.

### 5. TESTIMONY FAVORABLE TO STATE

Defendant asserts that his trial counsel was ineffective because he repeatedly elicited testimony regarding the alleged "war" between the Latin Kings and the Insane Deuces, which testimony allegedly bolstered the State's theory of the case. Defendant includes no citations to the record, despite the fact that the argument he presents requires an examination of the record. Consequently, defendant's claim is waived. See Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)); *People v. Isbell* (1988), 177 Ill. App. 3d 854, 864.

### 6. FAILURE TO STRIKE IMPROPER TESTIMONY

Finally, defendant claims that his trial counsel was not constitutionally effective because he did not seek instructions requiring the jury to disregard certain evidence. We disagree.

At trial, the State attempted to admit a photograph taken of defendant and others dressed in 1920's gangster suits and holding what appear to be guns. Gang task force investigator Langston testified that the photo had "significance in terms of gang-related activities." Defendant complains that, when the photograph was refused admittance, trial counsel should have asked for an instruction telling the jury to disregard the photograph. On cross-examination, however, trial counsel successfully got Langston to admit that the photograph was probably of the variety commonly posed for and purchased at fairs and amusements parks. As the State admits on appeal, trial counsel's questioning of Langston about the photograph made the State's case look unprofessional. We detect no ineffective assistance of counsel here.

Defendant also argues that his trial counsel should have obtained an instruction telling the jury to disregard evidence of a second gun found during the search of defendant's residence, but not tied to the shooting and not admitted into evidence. Defendant cites no authority to support his assertion that the testimony regarding the second gun was improper. Consequently, this argument is also waived pursuant to Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)). See also *People v. McCarthy* (1991), 213 Ill. App. 3d 873, 884-85.

For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

Affirmed.

GEIGER and DOYLE, JJ., concur.